JOSEPH TIERNEY
*vs.*
JOSEPH T. QUINN

Cumberland.   Opinion, December 8, 1961.

*Alton L. Yorke,*
*Hollis J. Allen,* for plaintiff.

*Lawrence P. Mahoney,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J.   This automobile accident case arises from the collision of the plaintiff's car operated by his sister-in-law and a car operated by the defendant. The case is before us on appeal from the direction of a verdict for the defendant at the close of the evidence.

It is agreed by the parties that the plaintiff's car was loaned or bailed to his sister-in-law under such circumstances that her negligence, if any, would not bar plaintiff's recovery for damage to the car. *Robinson* v. *Warren,* 129 Me. 172, 151 A. 10; *York* v. *Day's, Inc.,* 153 Me. 441, 140 A. (2nd) 730. This rule of law does not of course preclude consideration of her conduct in its bearing upon the proximate cause of the accident or upon the care or lack of care of the defendant under the circumstances. *Crockett* v. *Staples,* 148 Me. 55, 89 A. (2nd) 737; *Ross* v. *Russell,* 142 Me. 101, 48 A. (2nd) 403; *Fernald* v. *French,* 121 Me. 4, 115 A. 420.

We take the evidence in the light most favorable to the party against whom the verdict was directed. *Ward* v. *Merrill,* 154 Me. 45, 141 A. (2nd) 438.

The plaintiff's sister-in-law tells us in substance as follows: She was proceeding northerly on Forest Avenue, a highway four lanes in width, in Portland with the intention of crossing the Avenue westerly to reach a parking lot at the Moran Market. To accomplish this, she drove from the Avenue into the lot of a closed filling station, on her right, turned her car to the left, or westerly, stopped for traffic to pass, and then started directly across the Avenue. As she started she first saw the defendant's car approaching on Forest Avenue from the north and "just coming around the bend" at a distance of 380 yards measured by her after the accident. She next heard the squeal of brakes and saw the defendant's car when it was 25 feet from the collision. When the front wheels of plaintiff's car were in the parking lot and the rest of the car in the west traffic lane, it was struck by defendant's car.

The point of contact from the photographs was on the right side of the plaintiff's car between the windshield and the front bumper. The left front light of the defendant's car was broken, and there was other damage on the left side of the front of the car. There is no suggestion of any

personal injuries to the plaintiff's sister-in-law, her three year old daughter, the defendant, or his twelve year old son.

The evidence of speed is meager. The plaintiff's sister-in-law estimated her speed in crossing the Avenue at 10 to 15 miles per hour. From other sources there was evidence that the defendant was exceeding the agreed speed limit of 35 miles per hour without any closer estimate.

The width of the Avenue, as we shall later point out, was from 48 to 60 feet. It is not plain why this fact, so important and so readily proven, was left to the uncertainty of a rough estimate.

The presiding Justice, in directing the jury to return a verdict for the defendant, said:

> ". . . the Court does not see that the plaintiff has proven sufficient facts in the evidence to show that the defendant was negligent and that any conduct of his was the proximate cause of this accident, . ."

The driver of the plaintiff's car was mistaken in her description of the accident. On her evidence, the plaintiff's car traveled the width of the Avenue plus a very few feet in the period in which the defendant's car covered 380 yards, or 1140 feet. At speeds from 10 to 15 miles per hour the plaintiff's car would have taken from 2.2 to 4 seconds to reach the point of collision, and only a slightly longer time to have passed completely into the parking lot beyond the west traffic lane.

At 35 miles per hour the defendant's car would have taken 22 seconds to reach the point of collision, and at 45 miles per hour 17 seconds. We are given no estimate of what speed the defendant was traveling other than that he was exceeding the speed limit. It could not be found on this record, for example, that the speed was 60 miles per hour. We do no more than test the evidence with a

speed above the speed limit, and 45 miles per hour seems reasonable for this limited purpose.

No one expects mathematical accuracy in the relation of the incidents of an accident covering at most a few seconds. When, however, we find such wide disparity in the times it would have taken to bring two cars to a given point at the same moment, we must believe that the driver of the plaintiff's car was in error in fixing the place at which, or the place from which, or both, the defendant's car was first observed by her. In short, the accident could not, as we read the record, have happened as the driver of plaintiff's car tells us. *White* v. *Schofield*, 153 Me. 79, 134 A. (2nd) 755.

Turning to the evidence of three young men aged 17 and 18, who observed the accident from the filling station lot, we find no facts which sustain the plaintiff's position.

The first witness said in substance: that the plaintiff's sister-in-law "pulled over" to her right; that she did not go off the road; that he first saw the defendant's car at a distance of about 300 yards; that the cars came together as indicated by him on the blackboard; that "her front wheels were just about on the lot." Significantly, the witness testified:

"A    She turned just as shown on the diagram there, and Mr. Quinn, he was coming right along over his speed limit.

"Q    She turned right in front of him, didn't she?

"A    She was already turned when Mr. Quinn hit her.

"Q    She was going across the road right in front of him, wasn't she?

"A    Well, yes."

The second witness said: "she started to pull into the store and she got about six feet across the white line, I guess

about that, and Mr. Quinn hit her"; that the defendant was traveling "fairly fast"—(he) "would think" faster than the speed limit; that he heard the "squeal of tires" when the defendant's car was approximately 25 feet from the plaintiff's car; that the defendant's car was 90 to 100 yards away when plaintiff's sister-in-law started to cross the Avenue.

The only evidence of width of the highway is contained in the following extract from his testimony:

"Q You testified on direct examination that in your opinion Mrs. Kitchen had crossed the white line by about six feet?

"A Yes.

"Q When she was hit. Do you have any idea how wide that is?

"A About ten or twelve yards, I think.

"Q Thirty, thirty-four feet, you think?

"A Approximately.

"Q Do you know how the highway is lined?

"A Yes. There is just one white line down the middle. I don't know if it is a four lane or not."

If the witness meant, as seems likely, that the point of collision was 10 to 12 yards, or 30 to 36 feet, from the easterly side and 6 feet beyond the center line, then the Avenue was 48 to 60 feet in width. The witness further said that after the accident the defendant's car stopped midway between the edge of the Avenue and the center line, and the plaintiff's car was "a little ways into the parking lot. . ."

At most for the plaintiff from testimony of the second witness it appears that the plaintiff's car covered 36 feet and the defendant's car 270 to 300 feet in the same time.

On this testimony we have the defendant traveling 7 to 8 times as fast as the plaintiff's car. At a speed of 45 miles per hour it would have taken the defendant over 4 seconds to reach the point of collision. The evidence does not bear out this possibility.

The third witness testified that the defendant's car was roughly 20 yards distant when the plaintiff's car crossed the white line; that split seconds before the accident the front end of plaintiff's car "was just over the white line"; that he heard the "squeal of tires" when the defendant's car was 40 feet or so from the plaintiff's car. The witness did not place the point of impact.

The defendant on his part tells us that he first saw the plaintiff's car when it was 15 or 20 feet away; that his speed was 25 miles per hour or less, and in his own words, "that I don't pay any attention to cars parked on the side of the road. I was on my side of the road, and the first time I saw this Buick driven by Mrs. Ktichen was when it loomed up in front of me like an ugly monster or something."

From the evidence of the plaintiff's sister-in-law and the three young men, we find no solid foundation for findings of fact which would warrant a verdict for the plaintiff. No more did the defendant give testimony from which the jury could spell negligence.

Taking all of the evidence into consideration, we are left with guess and conjecture to form the basis of decision. Such ingredients do not make a verdict. The case was properly taken from the jury.

There is a further error fatal in itself to the success of the appeal. The testimony is tied to a "chalk" or diagram on a blackboard. There are repeated references to the chalk as a "fair representation" of the scene, of the position of the plaintiff's car before starting to cross the Ave-

nue, and of the point of collision. The "chalk" was used without apparently the slightest intent to preserve its contents for a record on appeal. Much of this evidence, so important at the trial, is without meaning to an appellate court in its attempt to reconstruct the action from the printed page. We cannot too strongly emphasize the duty on the part of an appellant to produce a satisfactory record.

A "chalk" is not evidence in itself, and yet it is often a most useful and indeed an indispensable tool in the courtroom in reconstructing the past or otherwise illustrating the testimony of the witness on the stand. Here, for example, the presiding justice had before him the "fair representation" of the scene to aid in making alive the action of a few seconds in which an automobile traveling along a city street collides with an automobile crossing its path. Without the "fair representation", the record lacks life. The unknowns are multiplied. What happened? What facts, in looking at the evidence in the light most favorable to the plaintiff, aided the justice in reaching his decision? Surely the "fair representation" on the blackboard with its marks and lines explained the evidence and made it more intelligible.

A diagram, or plan, properly introduced in evidence would have told us what the witnesses told the judge and jury. We would then have had the full story of the case available for our consideration. Photographs were introduced to describe the damage to the cars. So also a diagram or plan should have been introduced to preserve the meaning of the testimony. There is nothing to indicate that this procedure could not have been readily adopted.

By the nature of the appellate process, we lose the sights and sounds of the trial with the myriad of facts bearing upon the quality of evidence. This loss we cannot help, and this in fact is sound reason for the insistence by an appellate court that all aid available be given.

In this instance without a "fair representation", we do not have in fairness the record from which it was intended by the plaintiff, and the defendant as well, that the jury should decide the issue, and on which the presiding justice directed the decision on liability. *Stearns* v. *Smith,* 149 Me. 127, 99 A. (2nd) 340. See Annot. 9 A. L. R. (2nd) 1044, 1101.

The entry will be

*Appeal denied.*